ANDREWS v. COHEN (two cases).

(Supreme Court, Appellate Division, Second Department.   July 31, 1914.)

1. EASEMENTS (§ 44*)—RIGHT OF WAY—OVERHEAD BUILDINGS.
    An ordinary right of way in a city does not exclude building over the way, provided sufficient headroom is left for convenient passage.
    [Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

2. EASEMENTS (§ 61*)—RIGHT OF WAY—OBSTRUCTION—ESTOPPEL—INJUNCTION.
    Defendant contemplated constructing a theater on property adjoining a driveway, in which plaintiff had an easement.   Before beginning the work, defendant informed plaintiff of his intent to build an overhead passway, and exhibited the plans to him, and he made no objection until the work was completed.   The obstruction caused plaintiff only nominal damages, but, if restrained, would prevent defendant from obtaining an entrance to his theater from a certain street, which would cause him irreparable damage.   Held, that defendant was estopped from thereafter claiming that the incline was a violation of his easement, and he was not entitled to a mandatory injunction requiring its removal.
    [Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 102, 130–144, 148;   Dec. Dig. § 61.*]

3. EASEMENTS (§ 44*)—CONSTRUCTION—EXTENT OF RIGHT—SLEIGHS.
    Where a driveway easement included the right to pass through certain covered sheds, a provision guaranteeing to the grantee the right to pass with sleighs did not entitle the grantee, after the destruction of the sheds to an uncovered driveway open to the sky, merely to permit the fall of snow to facilitate the passage of sleighs.
    [Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

4. EASEMENTS (§ 44*)—CONSTRUCTION—EXTENT.
    Where an easement for a right of way granted the right to turn with reasonable care to pass an angle, but not for a wagon to be turned entirely round, such requirement measured the width of the easement, so that, though the space was increased by the removal of buildings, the right of way remained the same.
    [Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

5. INJUNCTION (§ 23*)—MANDATORY INJUNCTION—RIGHT TO WRIT.
    While the court, on application for a mandatory injunction to compel the removal of alleged encroachments on plaintiff's easement, cannot legalize the wrong nor relocate the easement, it is bound to balance the injury, and will refuse the writ in case plaintiff's loss is but nominal, while the granting of the writ will subject defendant to great hardship.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 22;   Dec. Dig. § 23.*]

Appeal from Special Term, Dutchess County.

Suit by James E. Andrews against George Cohen.   Appeal by defendant from a judgment of the Special Term granting a mandatory injunction to prevent interference by defendant with plaintiff's right of way, and directing the removal of defendant's structure, and also, by a separate record, from an order denying an application to reopen the case and take additional testimony.   Modified and affirmed.

See, also, 148 N. Y. Supp. 1104.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before JENKS, P. J., and THOMAS, RICH, STAPLE-TON, and PUTNAM, JJ.

Henry Hirschberg, of Newburgh (William L. Gellert, of Poughkeepsie, on the brief), for appellant.

Henry T. Fay, of Poughkeepsie, for respondent.

PUTNAM, J. Plaintiff, a hardware merchant at Poughkeepsie, is the owner of a lot on the north side of Main street, running back about 266 feet, upon the front of which is his store, and along the rear he has storehouses for agricultural implements and other merchandise. By express grants he has a right of way running westerly across from these rear buildings to an alleyway, which, running southerly, leads out upon Main street some distance to the westward of his store. This right-angled passageway was about 263½ feet in length, of varying widths. It passed through a shed or loft in which were doors or gates, which are referred to in the original grant. The greater portion of this right of way was by a deed from Charles W. Swift and wife to Robert E. Taylor, plaintiff's predecessor in title, in 1885, which provided:

"A right of way from the said land of the said Taylor, beginning where two large doors or gates now are erected, near the northeasterly corner of the land of Mark Shwartz, on the southerly end of the line now dividing the land of said parties of the first part from the land of the said Taylor and running thence always of sufficient width and with room to turn with reasonable care to the northern end of said alleyway and thence over said alleyway to Main street, over which right of way and land covered thereby, the said Taylor, his heirs and assigns and his and their servants and tenants and persons having business with them at all times, shall have the right to pass and repass to and from Main street to said land now owned by said Taylor on foot, or with horses, oxen, cattle, beasts of burden, wagons, carts, sleighs and other vehicles or carriages whatsoever; the right of way as above described is not to be so interpreted that there is to be room along it for a wagon to be turned entirely about, nor to require that the portion of the shed now covering that part of the said right of way nearest to said land of said Taylor, is to be removed until it shall be removed by natural causes or by the act of the parties of the first part or their assigns; the said Taylor, his heirs and assigns forever to have and hold the said easement and privilege to the said party of the second part and his assigns forever as appurtenances belonging to the said land of the said Taylor as aforesaid."

On November 1, 1911, Douglas Taylor, as successor in title of Robert E. Taylor, made a conveyance to plaintiff of two distinct parcels. He conveyed lot No. 279 Main street, occupied by the party of the second part as a hardware store. This lot measures approximately 266 feet by about 19 feet wide. The second parcel was the rear of lots 275 and 277 Main street northerly of the right of way over the rear of said lots as hereinafter granted, being a tract about 85 feet north and south, 38 feet east and west. The conveyance also granted this easement:

"Also a right of way thirteen (13) feet wide parallel and along the southerly boundary of the last above described parcel of land conveyed hereby over the rear of the lots numbered 275 and 277 Main street, still owned by the party of the first part for the use of the party of the second part, his heirs, and assigns in common with party of the first part, his heirs and assigns for ingress and egress to and from the premises hereby conveyed and to be ap-

purtenant thereto from and to the right of way which Charles W. Swift and wife, conveyed to Robert E. Taylor, his heirs and assigns, by deed dated November 7th, 1885, and recorded on the same date in Dutchess county clerk's office in Liber 223 of Deeds, at page 17; and also the use of said right of way to and from Main street conveyed by said Swift to Taylor in common with the party of the first part, his heirs and assigns, the same being hereby made appurtenant to the premises hereby conveyed, together with the appurtenances and all the estate rights of the said party of the first part in and to the said premises."

Plaintiff thus acquired the following rights of way, which, when conjoined, gave him access from the rear of lot No. 279 out to Main street. By the last deed he secured a right of passage (ingress and egress) to and from lot 279 to the gates at the Swift shed, being a passageway 13 feet wide and approximately 38 feet long. It led through the gates and under the shed, which was a distance of 16.4 feet more. Then it passed between open sheds and barns about 46 feet further, when it turned into the alley leading south 162½ feet to Main street—the last passage 10 feet 2 inches in width. The entire right of way was 263 feet long, of which the part in the rear of lots 275 and 277 had but a grant of a right of passage with no description of the kind of vehicles, or mention of sleighs. The right of way was nowhere fenced. As it approached Main street, it was narrowed to 10 feet 2 inches, and at the gateway at the east line of this shed was about 12 feet wide. After some years these doors or gates disappeared, leaving a lintel, which later was broken down.

The defendant, having in 1912 bought lands on both sides of this alleyway, costing $80,000, planned to erect a theater. From the Erts heirs, he purchased lands at the westerly part of this east and west passage, but not extending to Main street. From Douglas Taylor, his conveyance included lots numbered 275 and 277 Main street, on which he planned to build an entrance from Main street to the auditorium, over an incline bridging this right of way.

As early as October, 1912, plaintiff and defendant had general conversations as to these proposed designs. Apparently in April, 1913, some slight difficulties arose over plaintiff's goods, which it was claimed incumbered access along this right of way. At that time they talked of covering over this passageway, as it was mentioned frequently afterwards.

In July and August the defendant was engaged in the demolition of the old buildings along the east and west passageway, when he wholly removed the shed mentioned in the first grant. It is not denied that there were frequent interviews between plaintiff and defendant during this removal of the buildings, when plaintiff made no objection to the proposed alterations, although it is disputed how far the plaintiff knew the extent and full scope of defendant's design. When the wall of the main structure was started, and the cement posts or foundations were being laid for the pillars to carry this overhead incline to form the approach from Main street, plaintiff on September 4, 1913, began the present suit for an injunction and for the removal of the defendant's structures. The application for a preliminary injunction was denied, after the court had personally in-

spected the place. The defendant continued his operations, which resulted in building into and blocking the old right of way by the theater or auditorium building, and making a substituted passageway around this wall, and building over and covering the old way for a distance of about 63 feet, but leaving a clearance or headroom of 11½ feet from the bottom of the girders. The openings unbuilt upon about the building for plaintiff's driveway left a total passageway shortened by about 29 feet.

The trial, which was held in January, 1914, resulted in a decree for the plaintiff. The learned justice held that the term "sleighs" in the Swift grant, and the use of sleighs in the winter time in the plaintiff's business, required that the rights of way should be open and unobstructed to the sky during the entire length of the passage, so as to permit the fall of snow for the use of sleighs. Though the shed at the Shwartz lot had covered 16 feet of the passageway at a height of 8 feet, and had by the side gateposts limited its width to about 12 feet, the court held that, after defendant had torn down this structure, all right to have any overhead structure had been irrevocably lost. He found, which was undisputed, that the auditorium wall had encroached upon the original right of way, also that two posts upon concreted abutments stand in and upon the north line of the right of way given under the Taylor deed. He further found that the crossing structure left a headroom or clearance of 11 feet 6 inches. He negatived any acquiescence by plaintiff, indeed held that plaintiff did not know that his rights would be interfered with until some time in August, 1913. Plaintiff's damages since the beginning of the building and down to the time of trial were found in the nominal sum of six cents. Accordingly the injunction directed the removal of all defendant's structures and the restoration of the passageway, open above throughout, to be made within 60 days, by a decree entered March 26, 1914. Defendant appealed, and also moved to reopen the case so as to introduce further testimony, which application was also denied.

Such a result effectually bars and isolates defendant's lots and his theater structure. It cuts off all approach to Main street and virtually destroys the building used as a theater. The decree further imposes on defendant the heavy cost of demolition of all the structures erected on and over this passageway.

[1] The ordinary right of way in a city does not exclude building over it, providing sufficient headroom is left for the purpose of convenient passage. The right of the servient tenement, therefore, did not depend on keeping up this shed, as the servitude impressed by a right of way does not exclude building above and across it. Jones on Easements, § 397. While this shed stood, its headroom of eight feet measured the height of loads that could pass under it. On the plaintiff's theory, he became a great gainer by its destruction, since he now asserts a right, never exercised, to take loads in this passage of a height of 13 feet and upwards. The plaintiff not only knew his own requirements, but was especially familiar with the incidents of the different grants, which, as conjoined, made up his right of way.

[?] When the proposal to begin this removal of the old structures was made in April, 1913, plaintiff was called on to speak, and to object, if he meant afterwards to insist on an open right of way, after the shed was gone. Instead he gave the defendant to understand that he did not object to such changes. After the defendant had testified to his conversations with the plaintiff, and his exhibition to plaintiff of plans and sketches, and the plaintiff's acquiescence, plaintiff was recalled in rebuttal. He frankly admitted that defendant had asked him about going around the theater building, instead of along the old right of way, and had talked to plaintiff of building over the right of way. He was asked by his counsel:

"Q. Did you say to him that it would be nice to have your right of way covered? A. I don't remember that. Q. Do you remember meeting him in August on Main street? A. Yes, sir; a day, but I don't remember when it was; it was between 10 and 11 o'clock, and I handed him a card; and he said it was too small; and he said, 'I have a newspaper in my pocket;' and he sketched a diagram; and he said he was going to take the right of way; and I said, 'If you are, I will have to sit still.' Q. Is that the first time he said to you that he was going to take the right of way? A. Yes, sir. Q. Did you consent at that time? A. No, sir; didn't make any statement."

Therefore, on plaintiff's own admissions, he never objected or intimated disapproval, until after the shed was down, and the new building had been actually under construction. Counsel argues that the plaintiff had a right to remain noncommittal, also that the original plan or sketch, in which the plaintiff passively acquiesced, was something different from the structure that has since been erected. But the sole use of the entire venture, costing over $100,000, depended on a connection with Main street, and hence a crossing, either upon the ground or above plaintiff's right of way. Hence, in equity, plaintiff should have objected and made his objection in season.

The enumeration of vehicles in the grant from Swift, which included "sleighs," was a proper inclusion of the usual vehicles for such a driveway. When the grant mentions the uses, the omission of any might work an exclusion. Thus the right to have pigs driven in a passageway raised a question if horned cattle could also be so driven. Ballard v. Tyson, 1 Taunton, 279.

[3] The law of the road (1 R. S. p. 695, c. 20, tit. 13, § 7) provides:

"The term 'carriage,' as used in this title, shall be construed to include stagecoaches, wagons, carts, sleighs, sleds, and every other carriage or vehicle used for the transportation of persons and goods or of either of them."

Hence the mention of sleighs in this grant, read with the continued right to maintain this shed, did not of itself confer the unusual right of having this passageway kept open to the sky, merely to let snow fall to facilitate the passage of sleighs. Although the Taylor grant, in order to reach the way under this original grant, gave a right of way running to the eastward of this shed, it did not have incorporated in it all the terms of the Swift grant, but gave simply an ordinary right of passage.

Because the old barns and sheds to the westward upon the Erts land had an open courtyard at and about the turn into the Main street

alley, leaving there a space some 35 or 40 feet square, it does not follow that this enlarged area was all appropriated to plaintiff's easement.

[4] The grant gave a right "to turn with reasonable care," not that there is to be room "for a wagon to be turned entirely about," but for a wagon to turn into the northern end of the alleyway, and probably to meet and pass other vehicles there. And, however ample the space was left by the unbuilt courtyard about these buildings, this requirement measured the width of plaintiff's easement. When the buildings there were removed, the right of way was still limited by the stated requirements of room to turn with reasonable care. Johnson v. Kinnicutt, 2 Cush. (Mass.) 153; O'Brien v. Murphy, 189 Mass. 353, 75 N. E. 700; Lipsky v. Heller, 199 Mass. 310, 85 N. E. 453.

[5] The court cannot legalize a wrong. It cannot relocate this easement or direct plaintiff to accept any substitute. But, before sustaining a mandatory injunction, it has to weigh the "balance of injury"—the disproportion between the hardship of destroying defendant's structure and the harm to plaintiff by the changed right of way. 2 Pom. Eq. Remedies, § 552. What is plaintiff's loss by the altered driveway, which he alleges is "permanently injured, ruined, and destroyed"? Here the judgment finds plaintiff has sustained only nominal damages. Laughlin, J., in Batchelor v. Hinkle, 149 App. Div. 910, 133 N. Y. Supp. 501, said:

"The evidence in this record tends to show only nominal damages, and therefore I think that this complaint, which is for equitable relief, should have been dismissed without a finding as to the precise amount of damages, so that the plaintiff might, if she so desired, have her damages assessed by a jury."

Notwithstanding the reliance upon the plaintiff's constitutional rights, to ignore which seems to give a defendant the power of eminent domain, as was stated by the prevailing opinion of Ingraham, P. J. (Batchelor v. Hinkle, 140 App. Div. 621, 125 N. Y. Supp. 929), the judgment of injunction was reversed, because of its hardship upon the defendant (210 N. Y. 243, 104 N. E. 629).

It is settled in New York that mandatory injunctions will only be granted on proof of substantial injury, and not for damages that are merely nominal. Gray v. Manhattan R. Co., 128 N. Y. 499, 28 N. E. 498; Wormser v. Brown, 149 N. Y. 163, 43 N. E. 524. Therefore, on the grounds that the plaintiff did not seasonably object to the defendant's building, and that his damages, as found by the court below, were merely nominal, I advise that this injunction be modified so as to save the great hardship of its present command to tear down all structures and strictly to replace the original right of way. The injunction should require defendant to remove the posts and concrete foundations that are now within the lines of the plaintiff's right of way under the Taylor conveyance, as specified in the fifteenth conclusion of law, and the injunction should otherwise be withheld. Plaintiff to have the option, however, of having the cause retained for the determination of the entire damages to his rights in this easement, either by the court or by an issue submitted to a jury. The find-

ings of fact numbered 27, 32, 37, and 38 are reversed and stricken out.

As so modified, I advise that the judgment and order be affirmed, without·costs to either party. All concur.

---

### SHANKS v. DELAWARE, L. & W. R. CO.

(Supreme Court, Appellate Division, Second Department. July 31, 1914.)

1. COMMERCE (§ 27*)—FEDERAL EMPLOYERS' LIABILITY ACT—EMPLOYÉ ENGAGED IN INTERSTATE COMMERCE.

The test of whether a railroad employé is engaged in interstate commerce, so as to be within the protection of the federal Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1911, p. 1322), is the nature of the work being done at the time of the injury and not what the employe expects to do after completing his task.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

2. COMMERCE (§ 27*)—FEDERAL EMPLOYERS' LIABILITY ACT—EMPLOYÉ ENGAGED IN INTERSTATE COMMERCE.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

Burr, J., dissenting.

Appeal from Trial Term, Kings County.